UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
JANE REMLER,

                                               Case No.: **1:21-cv-5176**

                  **Plaintiff,**

       **-against-**

**CONA ELDER LAW, PLLC**
**f/k/a GENSER, DUBOW, GENSER & CONA, LLP, and**
**150 RIVERSIDE OP. LLC d/b/a**
**THE RIVERSIDE PREMIER REHABILITATION**
**AND HEALING CENTER,**

                  **Defendants.**
-------------------------------------------------------------------X

## ORIGINAL COMPLAINT

Plaintiff Jane Remler brings suit against Defendant Cona Elder Law, PLLC, formerly known as Genser, Dubow, Genser & Cona, LLP ("Cona"), a debt collection law firm, for their violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq*. and N.Y. Jud. Law § 487; and against Cona and Defendant 150 Riverside OP., LLC d/b/a The Riverside Premier Rehabilitation and Healing Center ("Riverside"), a nursing home, for violations of N.Y. Gen. Bus. Law § 349 *et seq*, negligence and gross negligence, and in support would show as follows.

### Summary of Claims[1]

More than thirty years ago, Congress passed the Nursing Home Reform Act (42 U.S.C. § 1396r *et seq.*) which established a number of important rights for residents of nursing homes and their families, including a prohibition on nursing homes requiring financial guarantees of third-parties as a condition of admission. In more recent years, the federal government has heeded concerns of facilities attempting to evade this prohibition by enacting additional regulations such

---

1 This summary is for the convenience of Defendants and the Court. The summary is not intended to limit the basis of Plaintiff's claims as the full factual basis for the claims are laid out in far greater detail in the statement of facts.

as 42 C.F.R. § 483.15, which states in pertinent part that nursing homes cannot even request a third party guarantee of payment to the facility as a condition of admission.

But Defendants in this action, a nursing home and its debt collection attorneys, have found a new way to evade this public policy that protects the elderly and their families. Unable to hold third parties, usually family members, liable for nursing home debts via admission agreements because of the federal law, Defendants fabricate claims of fraudulent conveyance, which allows them to bring third parties into their debt collection lawsuits and to demand attorney's fees from them on top of the nursing home debt. Similarly, Defendants fabricate claims under Family Court Act § 412 and the doctrine of necessaries, which allows them to bring third party spouses into their debt collection lawsuits. Nursing home residents tend to be judgment proof, making debt collection against them difficult or practically impossible. Obtaining liability against family members or third parties can provide access to bank accounts to be frozen and wages to be garnished. By deceptively and unfairly fabricating claims of fraudulent conveyance, Defendants can turn a negligible return into a full recovery with attorney's fees paid for by the other side. Therefore the debt collection law firm, Cona engaged in a widespread and systematic deceptive debt collection scheme to squeeze money out of hundreds of consumers who do not owe it. Riverside, a nursing home, exclusively used Cona to perpetuate this scheme against its residents and their family members. Plaintiff Jane Remler, whose husband Norman Blank was temporarily a resident at Riverside, was one of the innocents ensnared in this predatory debt collection scheme.

On or around September 18, 2020, Riverside, through Cona, sent a collection letter to Ms. Remler, alleging that there was a $9,784.98 debt for her husband's care and "upon information and belief, you had access to and/or received Norman Blank's assets and/or income,

which should have been remitted to The Riverside for the skilled residential nursing services provided to him." On October 19, 2020, Cona filed a Summons with Notice, signed by Mr. Haran, initiating a collection lawsuit against Ms. Remler and her husband. Nevertheless, on January 18, 2021, Riverside, by and through Cona, filed a Complaint against Plaintiff and her husband making baseless claims of fraudulent conveyance against them. All the fraudulent conveyance allegations, unlike the allegations for breach of implied contract and unjust enrichment, were made upon information and belief. The baseless fraudulent conveyance allegations also allowed Defendants to make a claim against Plaintiff and her husband for attorney's fees under NY Debtor & Creditor Law § 276-a. All of these allegations were verified by Defendant Brian J. Haran, and he falsely represented that he had performed a meaningful attorney review of the Complaint. When Ms. Remler filed a Motion to Dismiss, Defendants simply doubled down in their opposition on the baseless fraudulent conveyance allegations and the baseless allegations under Family Court Act § 412 and the doctrine of necessaries. The claims were facially insufficient, not stating the basic facts like when the alleged transfers occurred and alleging them only "upon information and belief" without giving any source for this knowledge. Prior to a decision on the Motion, Defendants stipulated to discontinue their collection lawsuit after receiving reimbursement from Ms. Remler and Mr. Blank's insurance company.

Cona files hundreds of debt collection lawsuits for complicit nursing homes like Riverside against nursing home residents and their family members as well as other third parties. Claims of fraudulent conveyance were made in more than 85% of the nursing home collection complaints filed by Cona since 2017, and every single one of these allegations was made without factual basis. Baseless claims under the Family Court Act § 412 were made by Cona in 28

3

complaints during this same period. Cona tacitly admits in these complaints that the fraudulent conveyance allegations do not have a factual basis as they are always alleged "upon information and belief," whereas the claims against the residents of the nursing homes for breach of contract and unjust enrichment are made without disclaimer or hedging. And the frivolousness of the Family Court Act § 412 claims is facially apparent because they always allege just one fact upon information and belief, that the resident and third party spouse were married, which is plainly insufficient to sustain a claim under the Family Court Act § 412.

The enormous cost of nursing home care will quickly impoverish a third party if they are made liable for it. That is why the federal government enacted the prohibition against third party guarantee requirements, as well as many other laws and regulations to ensure that nursing homes can and do seek compensation from insurance in addition to the resident. Rather than following the law and obtaining compensation from legitimate sources, Defendants have immiserated family members of nursing home residents like Plaintiff Jane Remler. To go after a spouse for a debt she does not owe, to sully her name and reputation with false accusations of fraud, is unconscionable, and Defendants must be stopped from continuing this business model of illicit disenfranchisement of some of New York's most vulnerable residents.

## A.   JURISDICTION AND VENUE

1.     The Court has federal question jurisdiction over the lawsuit because the action arises under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.*, ("FDCPA"). Jurisdiction of the Court arises under 28 U.S.C. § 1331 in that this dispute involves predominant issues of federal law under the FDCPA. Declaratory relief is available pursuant to 28 U.S.C. §§ 2201 and 2202.  The Court has supplemental jurisdiction under 28 U.S.C. §1367 over Plaintiff's state law claims because said claims are so related to the claims within the Court's original jurisdiction

that they form part of the same case or controversy under Article III of the United States Constitution.

2.      Venue in this District is proper because all or a substantial part of the events or omissions giving rise to their claims occurred in Queens County, New York.

## B.    PARTIES

3.      Plaintiff Jane Remler is an individual residing in Queens County, New York.

4.      Defendant CONA ELDER LAW, PLLC ("Cona") is a law firm and professional limited liability corporation organized under the laws of the State of New York. Said Defendant engages in business in New York. This suit arose out of said Defendant's business in New York. Cona was formerly known as Genser, Dubow, Genser & Cona, LLP.

5.      Cona regularly collects consumer debts owed or due to others, specifically for nursing homes like Defendant Riverside, by filing hundreds of collection lawsuits and sending thousands of collection letters. Cona is therefore a debt collector as defined in 15 U.S.C. § 1692a(6).

6.      From 2017-2020, Cona has filed approximately 490 nursing home debt collection lawsuits in New York Supreme Courts.

7.      Defendant   150   RIVERSIDE   OP.   LLC   d/b/a   THE   RIVERSIDE   PREMIER REHABILITATION AND HEALING CENTER ("Riverside") is a limited liability company organized under the laws of the state of New Jersey that provides residential nursing home care and services at premises located at 150 Riverside Dr, New York, NY 10024.

8.      Riverside has used Cona to file all 45 of its collection lawsuits since 2016.

9.      Cona was the free chosen counsel of Riverside. Cona was the agent of Riverside acting in the course and scope of that agency. For these reasons and others, Riverside is jointly and

severally liable for the acts of Cona on behalf of Riverside. Therefore, when acts are taken by Cona on behalf of Riverside this Complaint will at times simply identify those acts of Defendants, jointly and severally.

## C.  STATEMENT OF FACTS

10.    On December 24, 2019, Plaintiff Jane Remler took her husband Norman Blank to Riverside to receive skilled nursing care after he had a spinal cord surgery for osteomeyellitis in his spinal column.

11.    Mr. Blank was supposed to be a Riverside for physical therapy, but he was provided very little therapy during this crucial post-operative period of recovery.

12.    He developed bedsores while at Riverside and was treated rudely by the staff. He felt like he was in prison and that the people who were supposed to be providing him with physical therapy were more like prison guards.

13.    On February 18, 2020, Mr. Blank's insurance company determined, against the request of Mr. Blank's physician, that he no longer needed skilled nursing care and should be transferred to "custodial care or home with home care." **Exhibit A** (Insurance Letter Denying Further Coverage).[2]

14.    In effect, this meant that if Mr. Blank continued to stay at Riverside, his care would not be covered by his insurance company. Crucially however, the letter noted that "Additional days are approved for arranging needed equipment and planning safe transition." *Id.*

15.    In other words, while the care from February 21, 2020 to discharge was deemed to not be medically necessary, the insurance company would cover additional days in transitioning to his new care at home.

---

2   All Exhibits attached to this complaint are incorporated by reference in their entirety.

16.    While Ms. Remler and her husband did attempt to appeal the decision, Mr. Blank was ultimately discharged from Riverside on March 10, 2020. **Exhibit B** (Notice of Discharge).

17.    While they disagreed that Mr. Blank's "health and safety ha[d] improved sufficiently so that [Mr. Blank] no longer need[s] services provided by [Riverside]," they decided it was better for Mr. Blank to get out of a place that had treated him so terribly. *Id.*

18.    Mr. Blank was at Riverside from February 21 through March 10, a total of 18 days, after his care had no longer been deemed medically necessary.

19.    On or around May 6, 2020, Mr. Blank was sent an Explanation of Benefits Statement for the day of his discharge, which reflected that he owed $0 to Riverside. **Exhibit C** (May 6, 2020 Statement).

20.    On or around May 15, 2020, Mr. Blank was sent another Explanation of Benefits Statement, this time for services he allegedly received from March 2 through March, 2020, and again it reflected that he owed $0 to Riverside. **Exhibit D** (May 15, 2020 Statement).

21.    On or around May 28, 2020, Mr. Blank's insurance sent a letter to Riverside informing it that it was overbilling Mr. Blank for services on February 21, 2020. **Exhibit E** (Overbilling Letter).

22.    Despite this notice of overbilling, Riverside assigned the debt to Cona for collections.

23.    Cona mailed Ms. Remler a letter dated September 18, 2020, alleging that $9,784.98 was owed to Riverside, and attached an invoice which alleged that $4,581 was owed for Room & Board from February 21-29, 2020; $311.49 was owed for "Add-On" from February 21-29, 2020; $4,581 was owed for Room & Board from March 1-9, 2020; and $311.49 was owed for "Add-On" from March 1-9, 2020. **Exhibit F** (Collection Letter).

24.    The September 18, 2020 Cona Collection Letter made some of the same deceptive and

unfair misrepresentations to Ms. Remler that Cona would later make in its collection lawsuit.

25.     The Collection Letter alleged "you had access to and/or received Norman Blank's assets and/or income, which should have been remitted to The Riverside for the skilled residential nursing services provided to him," and made that defamatory statement "on information and belief."  That defamatory letter was seen by, *inter alia*, Mr. Blank.

**Defendants' Deceptive and Unfair Collection Lawsuit Against Ms. Remler for a Debt She Did Not Owe**

26.     On October 19, 2020, Riverside, by and through their attorneys Cona, filed a Summons with Notice against Norman Blank and Ms. Remler. **Exhibit G** (Summons with Notice). The entirety of the substantive claims in the document was:

> "Statement of the nature and substance of Plaintiff's cause of action: Breach of Implied Contract, Unjust Enrichment and Breach of Family Court Act §412.
>
> The relief sought is $9,748.98 with interest from March 1, 2020." *Id.*

27.     The Summons did not state which claim was brought against which defendant much less provide a factual basis for any claim.

28.     On or around October 20, 2020, Mr. Blank's insurance sent him a letter stating that his appeal of coverage for February 21, 2020 to March 10, 2020 was withdrawn because "there is no inpatient Room and Board claim on file for above listed date of services so please dispute these charges with the facility or submit a claim to Oxford Health Insurance, Inc." **Exhibit H** (Insurance Letter Stating No Claim).

29.     Upon information and belief, Riverside had responded to the notice of overbilling from Mr. Blank's insurance (**Exhibit E**) by simply withdrawing the claim, filing a baseless lawsuit against Ms. Remler rather than resolving the issue with the insurance company.

30.     On December 10, 2020, Ms. Remler and Mr. Blank filed a demand for a complaint in the

collection lawsuit by Defendants against them. **Exhibit I** (Demand for Complaint).

31.     On or around December 29, 2020, Mr. Blank was sent an Explanation of Benefits Statement which asserted that he owed money to Riverside for services provided after his care at Riverside was deemed to be not medically necessary, specifically $4,275 for room & board and services on February 21, 2020. **Exhibit J** (December 29, 2020 Statement). Mr. Blank was sent other Explanation of Benefits Statements for the same alleged debt to Riverside on or around February 11, 2021 (**Exhibit K**) and February 23, 2021 (**Exhibit L**).

32.     On January 18, 2021, Riverside, by and through Cona, filed a Verified Complaint. **Exhibit M** (Verified Complaint).

33.     The Verified Complaint was signed and filed by Cona attorney Brian J. Haran, who also executed the Attorney's Verification to the Complaint stating in pertinent part "I have read the annexed COMPLAINT, know the contents thereof, and the same are true to my knowledge, except those matters therein which are stated to be alleged on information and belief, and as to those matters I believe them to be true based upon my own investigation and knowledge, as well as conversations with my client and review of documents provided to me in connection herewith." *Id.,* p. 10.

34.     The causes of action in the Complaint for Breach of Implied Contract and Unjust Enrichment were brought only against Norman Blank, not against Jane Remler.

35.     For the first time, Defendants alleged that Norman Blank and Jane Remler had committed fraudulent conveyance, specifically that Mr. Blank "wrongfully conveyed his assets and income to the Defendant, JANE REMLER-BLANK, without fair consideration, in order to prevent Plaintiff from recovering monies due it for services provided to the Resident-Defendant and said conveyances were accepted by the Defendant." *Id.* ¶ 17.

36.     This allegation was made "Upon information and belief"; in fact, all pertinent allegations of fraudulent conveyance against Mr. Blank and Ms. Remler were made "Upon information and belief." *Id.* ¶¶ 17-18, 21-22, 30-31, 34-35.

37.     Cona made the allegations regarding fraudulent conveyance "Upon information and belief" because neither it nor Riverside had any factual basis for believing that either Mr. Blank or Ms. Remler had committed fraudulent conveyance against them. *Id.*

38.     Making the allegations "Upon information and belief" was not some quirk of drafting or reasonable precaution by Defendants – it was Defendants tacitly admitting that their fraudulent conveyance allegations lacked a factual basis.

39.     This is clear from a comparison of the fraudulent conveyance allegations, made "Upon information and belief," versus the allegations of breach of implied contract and unjust enrichment, which were alleged without disclaimer and were made with actual facts.

40.     However, Defendants' allegation in the Verified Complaint that Mr. Blank "failed and neglected to…timely apply for and secure third party payment to Plaintiff" are also false. To the contrary, upon information and belief, Riverside was responsible for the failure to secure third party payment due to its own negligence.

41.     The baseless allegations of fraudulent conveyance were a cynical litigation tactic to bring Plaintiff into the collections lawsuit without running afoul of the prohibition under the Nursing Home Reform Act, 42 U.S.C. §§ 1396r *et seq.,* against making third parties financially liable for residents.

42.     Other than fraudulent conveyance, Defendants also alleged that Ms. Remler was liable for support of her spouse under the Family Court Act § 412 and the Doctrine of Necessaries. But even these claims were threadbare and failed to allege a *prima facie* cause of action, missing the

essential elements for either claim.

43.     The Family Court Act § 412 claim was facially frivolous, solely asserting that Ms. Remler and Mr. Blank were married and nothing else, which is plainly insufficient to allege a claim.

44.     While Ms. Remler is indeed married to Mr. Blank, simply alleging that Defendants are married is insufficient to state a cause of action for Family Court Act § 412.

45.     Defendants did not allege that Mr. Blank was unable to satisfy the debt out of his own resources, did not allege that the necessaries were furnished on Ms. Remler's credit, and did not allege that Ms. Remler had the ability to satisfy the debt. Upon information and belief, Defendants did not allege any of these elements because they had no facts to substantiate them.

46.     In short, Ms. Remler was only "liable" for the debt of her husband based on a baseless claim of fraudulent conveyance and unsubstantiated claims of breach of Family Court Act § 412 and the doctrine of necessaries.

47.     But most crucially, the baseless fraudulent conveyance claim also provided justification for Defendants to demand attorney's fees from Ms. Remler despite having no right to do so in contract or law.

**In The Complaint, Defendants' Falsely Represented For The First Time The Right To Seek Attorney's Fees**

48.     The Summons With Notice Defendants served on Ms. Remler did not mention fraudulent conveyance, made no demand for attorney's fees, and the term appeared nowhere on the document. **Exhibit G.**

49.     However, the Verified Complaint represented to Ms. Remler for the first time that Defendants had a lawful right to obtain attorney's fees.

50.     This was false.

51.     This defamatory allegation that Ms. Remler committed fraudulent conveyance was seen by her husband, Mr. Blank.

52.     Defendants represented to Ms. Remler that Cona had meaningfully reviewed the facts and circumstances of this case against Ms. Remler and her husband, and made an independent legal determination that they were liable for attorney's fees.

53.     This was also false.

54.     The false allegations of fraudulent conveyance also served as an attempt to further monetize the lawsuit by providing a false basis for entitlement to attorney's fees under New York Debtor & Creditor Law § 276-a. **Exhibit M**, ¶¶ 25, 38.

55.     Attorney's fees under DCL § 276-a are only available "where such conveyance is found to have been made by the debtor and received by the transferee with actual intent, as distinguished from intent presumed in law."

56.     The Summons with Notice did not indicate that Defendants were claiming any fraudulent conveyance or seeking attorney's fees. **Exhibit G**.

57.     Because Ms. Remler and Mr. Blank did not commit fraudulent conveyance, and Defendants had no factual basis for alleging they committed fraudulent conveyance, the demand for attorney's fees was an attempt by Defendants to collect amounts from Plaintiff not expressly authorized by law or contract, and otherwise misrepresenting the amount allegedly owed.

58.     And Cona failed to make a meaningful attorney review of the facts and circumstances of the case sufficient to determine whether there was a factual basis for the demand for attorney's fees.

59.     This failure to perform a meaningful attorney review is a separate violation from the more general failure of Cona to perform a meaningful attorney review sufficient to determine if

Ms. Remler had any liability before initiating the lawsuit. Cona additionally failed to perform a meaningful attorney review of the facts and circumstances of the case to determine whether there was, not just fraudulent conveyance, but specifically fraudulent conveyance with actual intent sufficient to justify attorney's fees under DCL § 276-a.

60.     The express citation of DCL § 276-a in the Complaint evinces that either Cona failed to perform a meaningful attorney review of the factual basis to determine whether there was fraudulent conveyance with actual intent or Cona did perform a meaningful attorney review, found no factual basis, and misrepresented entitlement to attorney's fees under DCL § 276-a despite finding no factual basis.

61.     Because the fraudulent conveyance claim was baseless and Defendants' allegations under the doctrine of necessaries were insufficient to state a claim, the amount actually owed by Plaintiff was $0.

62.     Realizing the seriousness of the attempts to collect unwarranted attorney's fees and make Ms. Remler liable for a debt she should not have been sued for, Plaintiff and Mr. Blank retained The Law Office of Ahmad Keshavarz, the undersigned, to represent them in the collection lawsuit, becoming contractually liable to pay attorneys' fees and costs. The Cona demand for attorney's fees was a factor in Ms. Remler retaining an attorney. Ms. Remler understood attorneys are expensive and was understandably concerned that the amount of fees she may be liable for could be substantial.

63.     On the same date, February 5, 2021, Plaintiff, through her newly hired attorneys, filed a Motion to Dismiss. **Exhibit N** (Motion to Dismiss).

64.     Defendants doubled on their misrepresentations in their Opposition to the Motion on February 18, 2021. **Exhibit O** (Opposition to MTD).

65.     Plaintiff responded with a Reply on February 25, 2021. **Exhibit P** (Reply). For 7 more months, Cona maintained its opposition to dismissing the Collection Lawsuit.

**Defendants Apparently Inflated The Amount Of The Debt Sought in the Lawsuit Due To Riverside's Negligence.**

66.     On or around March 2, 2021, Mr. Blank was sent an Explanation of Benefits Statement which asserted that he owed $8,550 for room & board and alleged services on March 1, 2020. **Exhibit Q** (March 2, 2021 Statement).

67.     On or around April 29, 2021, Mr. Blank's insurance wrote a letter to Riverside, referencing a prior request on April 8, 2021 for more information in regards to the claim for services provided on March 1, 2020. **Exhibit R** (April 29 Insurance Letter Requesting Additional Information).

68.     On or around May 24, 2021, Mr. Blank's insurance wrote a letter to Riverside, referencing a prior request on May 3, 2021, asking for more information about the services provided on February 21, 2021. **Exhibit S** (May 24 Insurance Letter Requesting Additional Information).

69.     Upon information and belief, Riverside's failure to promptly provide information about alleged services it provided to Mr. Blank, as reflected by the need for Mr. Blank's insurance to write to Riverside multiple times soliciting additional information, delayed determinations of coverage.

70.     On or around July 15, 2021, Mr. Blank was sent an Explanation of Benefits Statement which asserted that his insurance paid the alleged debt owed for services on February 21, 2020. **Exhibit T** (July 15, 2021 Statement).

71.     Upon information and belief, the negligence of Riverside was the reason for Mr. Blank's insurance not covering the alleged debt until on or around July 15, 2021.

72.     The reckless disregard for Mr. Blank's rights is evinced by the fact that Riverside was put on notice by Mr. Blank's insurance on May 28, 2020 that they were overbilling Mr. Blank for the services on February 21, 2020 (**Exhibit E**), and that the problem was not resolved until more than a year later on July 15, 2021 and well after Riverside, by and through Cona, had filed a lawsuit on the alleged debt.

73.     Similarly, on or around August 13, 2021, Mr. Blank was sent an Explanation of Benefits Statement which asserted that his insurance paid the alleged debt owed for services on March 1, 2020. **Exhibit U** (August 13, 2021 Statement).

**Eleven months after having frivolously sued Ms. Remler, Cona Discontinues the Collection Lawsuit.**

74.     Riverside, having its debt satisfied by the insurance company around July, 2021, agreed in August, 2021, to the filing of a Stipulation of Discontinuance. Apparently the only reason Riverside filed the collection lawsuit against Mr. Blank and Ms. Remler was because of its own incompetence in submitting insurance claims information, if not malfeasance in overbilling the insurance company. The contradictory billing statements suggest that the amount Cona claimed due in its Collection Letter and Lawsuit was inflated.

75.     On September 15, 2021 Cona finally signed a Stipulation of Discontinuance with Prejudice. This was 11 months after Cona frivolously sued Ms. Remler, 7 months after Ms. Remler was forced to retain counsel to file a motion to dismiss, and 7 months from when Cona doubled down and fought to continue the frivolous suit against her. The Stipulation of Discontinuance was signed without the Court ever having ruled on the Motion to Dismiss.

76.     On September 16, 2021 Ms. Remler filed the Stipulation of Discontinuance With Prejudice, and the Court so-ordered the case discontinued that same day. **Exhibit V** (Stipulation of Discontinuance).

77.    Ms. Remler incurred a $35 fee filing the Discontinuance.

**Defendants' pattern and practice of deceptively alleging fraudulent conveyance to hold family members of residents and other third parties liable for debts shows a callous and willful disregard for the rights of these innocent parties.**

78.    Defendants unlawfully increase their revenue by creating illicit schemes to increase collection of nursing home debts, with the added benefit of the debt collector seeking its attorney's fees from the putative debtors rather than the nursing home.

79.    Defendants are not the first in the nursing home industry to realize the advantage that could be obtained by making baseless allegations of attorney's fee to discourage consumers from fighting what could be baseless lawsuits.

80.    In *Samms v. Abrams, Fensterman,* the debt collector for Plaintiff's former nursing home was found to have violated the FDCPA and GBL § 349 for seeking attorney's fees in its complaints without a factual or legal basis. *Samms v. Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara & Wolf, LLP*, 163 F. Supp. 3d 109 (S.D.N.Y. 2016).

81.    Defendants here have gone a step further than the Abrams firm however by not only seeking attorney's fees with no factual basis but also bringing in innocent third parties with no factual basis.

82.    Defendants' conduct is a disturbing trend in how the worst actors in the nursing home industry can use deception as a standard practice to increase the value and viability of their collection lawsuits.

83.    And Defendants' twisted "innovation" to go after innocent family members and other third parties for nursing debts is exactly why Congress passed the Nursing Home Reform Act, 42 U.S.C. §§ 1396r *et seq.*

84.    To avoid any ambiguity on the issue, CMS published 42 C.F.R. § 483.15 on October 4,

2016, which stated in pertinent part that a nursing home "must not request or require a third party guarantee of payment to the facility as a condition of admission or expedited admission, or continued stay in the facility." CMS noted that comments to the proposed rule expressed concerns "that facilities evade the prohibition on requiring a third-party to guarantee payment." 81 FR 68732.

85.     It is notable that this affirmation that nursing homes could not force liability onto third parties was right around the time that Cona began making fraudulent conveyance claims without any factual basis.

86.     As federal regulators took increased action to ensure the purpose of the third party guarantee prohibition is enforced, Defendants discovered they could illicitly obtain third party liability, not through admission agreements, but instead through baseless claims of fraudulent conveyance.

87.     Defendants' illicit scheme in short is to bring fraudulent conveyance claims without factual substantiation in order to make third parties, usually family, liable for the debt, and entitle Cona to attorney's fees.

88.     The Cona complaints in this illicit scheme are inherently suspect because of the identical boilerplate and conclusory allegations made in them.

89.     At minimum, these fraudulent conveyance claims demonstrate a lack of meaningful attorney review, with Cona failing to investigate the facts at issue, and in the case of Ms. Remler and others, the fraudulent conveyance claims are purely fabrications.

90.     During the period of January 1, 2017 to December 31, 2020, Cona routinely filed collections lawsuits against family and friends of nursing home residents not otherwise liable for the debts, such as Ms. Remler, alleging fraudulent conveyance without any factual basis for the

claim and, upon the basis of those fraudulent conveyance allegations, demanding judgment for attorney's fees.

91.     Nearly all of these lawsuits were initiated, like the lawsuit against Ms. Remler, with a summons with notice and without a complaint, masking the demand for attorney's fees and the lack of factual allegations until the defendant demanded a complaint.

92.     A review of publicly filed collections lawsuits by Cona on behalf of nursing homes from January 1, 2017 through December 31, 2020 in New York State Supreme Courts produced a list of approximately 490 lawsuits. Despite the COVID-19 pandemic and associated shutdowns, Cona still filed more collections lawsuits for nursing homes in 2020 than in 2019.

93.     Of the 490 lawsuits, only 128 have a complaint. Of those complaints, 110 sought attorney's fees in the prayer on the basis of fraudulent conveyance claims. These claims for fraudulent conveyance allege, without facts, transfers by the resident to a third party, usually a family member, with the intent to defraud the nursing home at issue.

94.     All of the 110 complaints alleging fraudulent conveyance made those allegations about fraudulent conveyance "upon information and belief" like the Complaint against Ms. Remler. **Exhibit M**.

95.     Of the 490 lawsuits, 66 brought claims under Family Court Act § 412.

96.     28 of these 66 lawsuits with Family Court Act § 412 claims had complaints, and every single one of those complaints had the same threadbare single allegation upon information and belief that was made against Ms. Remler: "Upon information and belief, at all times hereinafter mentioned, the Resident-Defendant and the Defendant are husband and wife."

97.     These 28 complaints with baseless claims under Family Court Act § 412 are not just poor drafting on the part of Cona, as recently recognized Judge Lucy Billings. *See Jopal Bronx LLC*

*d/b/a Workmen's Circle Multicare Center v. Montilla, et al.*, No. 160192/2019, 2021 WL 3492240 (N.Y. Sup. July 30, 2021).

98.     In *Jopal*, a nursing home sued Milagros Montilla over the debt incurred by her husband Mateo Montilla, and on a motion for summary judgment, the court ruled in favor of Ms. Montilla because on the threadbare allegations under the doctrine of necessaries, "Ms. Montilla would have no independent obligation to plaintiff." *Id.* at *1.

99.     Following the Order on her Motion for Summary Judgment, Ms. Montilla moved the court for costs, including attorney's fees, and sanctions "based on plaintiff's frivolous actions against her," including bringing a baseless claim under the doctrine of necessaries. *Id.*

100.    Judge Billings granted the Motion for costs, noting that the nursing home failed to plead the doctrine of necessaries "essential elements" and this failure "indicates that plaintiff either failed to conduct a rudimentary investigation and routinely sues both the patient and the patien's spouse for payment or, after an investigation revealed the absence of the essential elements, instituted the action against Ms. Montilla anyway." *Id.* at *2.

101.    Judge Billings went on to say that "plaintiff's or its attorney's conduct was completely without merit, warranting the imposition of sanctions…[p]articularly when plaintiff failed to discontinue its claims against Ms. Montilla after her attorney advised plaintiff's attorney, in writing, that its claims against Ms. Montilla were meritless, requested that plaintiff discontinue them, and warned that, if it did not, Ms. Montilla would seek her attorney's fees, sanctions are justified." *Id.*

102.    And "Plaintiff's opposition both to Ms. Montilla's motion to dismiss the claims against her and her motion for sanctions were unpersuasive in sustaining either of its claims against her and are unpersuasive in demonstrating that plaintiff pursued its claims in good faith and did not

engage in "frivolous" conduct." *Id.*

103.   This is the exact circumstances faced by Ms. Remler – Defendants failed to plead the essential elements, Ms. Remler brought her Motion to Dismiss putting them on notice that these claims lacked their essential elements, and Defendants' filed their Opposition to the MTD doubling down on their frivolous claims rather than immediately discontinuing them.

104.   Defendants here actually are even more egregious in their Family Court Act § 412 and doctrine of necessaries claims than the nursing home and its attorney in *Jopal.* In *Jopal,* the nursing home did allege that the medical necessities provided "were furnished on the credit of DEFENDANT" (*Id.* at *1) – in the lawsuit against Ms. Remler, and in all of the 28 complaints where Family Court Act § 412 claims are made, there are no allegations that the necessaries were furnished on the credit of the third party spouse.

105.   From 2017-2020, all of Cona's allegations of fraudulent conveyance on behalf of nursing homes had the same or similar deficiencies.

106.   Alleging fraudulent conveyance without any facts, as evinced by the standard use of making those fraudulent conveyance allegations "upon information and belief," evinces that lack of meaningful attorney review of these complaints by Cona is consumer-oriented, particularly as frequently juxtaposed to allegations for breach of contract or unjust enrichment made against Residents in many of the same complaints without any such disclaimer like "upon information and belief."

107.   As such, Defendants alleging fraudulent conveyance without any factual basis and demanding attorney's fees in the complaint against Ms. Remler is consumer-oriented conduct, having a broader impact on consumers at large, in addition to Ms. Remler.

108.   This egregiously deceptive practice of filing complaints alleging fraudulent conveyance

without any factual basis and demanding attorney's fees exhibits an extreme pattern of legal delinquency by Cona.

### Filing meritless claims for fraudulent conveyance is especially pernicious in collection of nursing home debts

109.　In addition, by demanding judgment for attorney's fees when none are allowed, Defendants deceive consumers into believing that they may incur additional amounts for Cona's attorney's fees if they challenge the complaint than if they do not. Therefore, this misrepresentation may make consumers less likely to challenge the allegations of the complaint, and more likely to default or to pay the debt.

110.　This is especially true because the complaints seek to collect putative nursing home debts. Generally, when a consumer incurs a debt, she knows the item she is purchasing and the cost of that item.  This is not true for medical debts.  In medical debts, the bills are issued from the provider to the insurance carrier.  The cost of the same service varies by who the payer is (*e.g.* a private insurer, Medicaid, or an uninsured consumer), rather than the nature of the service itself. The cost to the consumer of the same exact service would vary dramatically based upon whether there is an exclusion in coverage, whether the deductible has been reached, whether the provider properly and timely submitted the claim to the insurance carrier, or for a host of other reasons, most unknown to the consumer.

111.　This case is unfortunately a prime example of how consumers are kept in the dark about the actual cost of nursing home care. From March 5, 2020 to August 13, 2021, Plaintiff and her husband received 15 Explanation of Benefits Statements alone (including **Exhibits C, D, J, K, L, Q, T,** and **U**), many of them providing contradictory information, and additionally they were being told by their insurance company that Riverside was overbilling (**Exhibit E**), that there was no claim to insurance at all for the debt (**Exhibit H**), and that Riverside was failing to provide

21

necessary information to the insurance company (**Exhibits R** and **S**). And even with all 19 documents of these documents reviewed, it remains unclear how the Riverside invoice alleging $9,784.98 was calculated (**Exhibit F**), let alone whether that was the amount owed as of September 18, 2020, as of October 19, 2020, or as of January 18, 2021.

112.   It is unclear whether $9,784.98 was ever a correct statement of the amount of the nursing home debt.

113.   Therefore, even more so than consumer sued for other types of debts, consumers sued by Defendants for nursing home debts would have little way of knowing if the amount claimed due in the complaint was even remotely accurate.

114.   What they would see is a large amount of money sought by the Defendants; the typical annual cost of nursing home care in 2016 was $82,000, so even a fraction of that cost is far more money than most people have on hand or in savings.

115.   As such, Cona's demand for attorney's fees using unsubstantiated allegations of fraudulent conveyance is particularly pernicious as consumers with the least knowledge of the accuracy of the debt are the most discouraged from challenging the accuracy of the debt, again because those consumers would be afraid that the challenge would increase the attorney's fees to be awarded in judgment for Cona.

116.   In a perverse turn, Defendants have made allegations of fraudulent conveyance into a deceptive scheme itself.

117.   Defendants attempted to collect $9,748.98 with interest from March 1, 2020 and an unstated amount in attorney's fees, from Ms. Remler over fabricated claims of fraudulent conveyance made against her and her husband and baseless claims against her under Family Court Act § 412 and the doctrine of necessaries. Their business model is built around

immiserating innocent family members like Ms. Remler.

**Cona's Claims Were Determined to Be Baseless by the Court in a Similar Case**

118.    On June 18, 2020, a nursing home called Wartburg through Cona filed a Complaint against a man named Alphonso Franklin and his deceased mother making baseless claims of fraudulent conveyance against them. **Exhibit W** (*Franklin* Complaint).

119.    Like Ms. Remler, Mr. Franklin had to retain counsel to file a Motion to Dismiss. *Id.* ¶ 58.

120.    On  April 1, 2021, the Honorable Judge Eddie J. McShan granted Mr. Franklin's Motion to Dismiss, dismissing all of the causes of action against him for failure to state a cause of action and dismissing the entire matter because the causes of action alleged against Ms. Franklin were a nullity because she was deceased. **Exhibit X** (Order Dismissing Action).

121.    The Order perceptively outlined the lack of factual basis in the fraudulent conveyance claims: "Plaintiff does not provide any allegations in its Amended Verified Complaint to suggest when the alleged fraudulent transfer took place, particularly since Ms. Franklin may have been suffering from dementia during her stay in the nursing home." **Exhibit X**, p. 6.

122.    What few allegations were made about fraudulent conveyance were "overly broad and vague and insufficient to determine if the alleged fraudulent transfer was made during her residency  in the nursing home or years before." *Id.,* pp. 6-7.

123.    Judge McShan noticed that the "key allegations regarding the alleged fraudulent conveyances are based on information and belief and are inadequate under CPLR 3016(b) because Plaintiff failed to reveal the source of the information." *Id.,* p. 7. Defendants of course "failed to reveal the source of the information" because there was no source – the allegations of fraudulent conveyance were fabricated whole cloth in a cynical ploy to bring in a living party, Mr. Franklin, and to make a demand for attorney's fees.

124.   Similarly, Judge McShan also pointed out that the allegations "that the fraudulent transfers were made without fair consideration because the relevant allegations were all made '[u]pon information and belief' again without revealing the source of the information.'" *Id.*

125.   While Defendants did file a Notice of Appeal of the Order on April 27, 2021, the Order's reasoning is persuasive on its face, both for the collection lawsuit against Mr. Franklin and the collection lawsuit against Ms. Remler.

126.   Like in the case against Mr. Franklin, the Complaint against Ms. Remler "does not provide any allegations…to suggest when the alleged fraudulent transfer took place."

127.   Like in the case against Mr. Franklin, the allegations of fraudulent conveyance in the Complaint against Ms. Remler were "overly broad and vague and insufficient to determine if the alleged fraudulent transfer was made during [Mr. Blank's] residency  in the nursing home or years before."

128.   And like in the case against Mr. Franklin, the "key allegations regarding the alleged fraudulent conveyances [in the Complaint against Ms. Remler] are based on information and belief and are inadequate under CPLR 3016(b) because Plaintiff failed to reveal the source of the information." *Id.,* p. 7.

**Defendants' deceptive scheme added insult to injury after Riverside's improper care of Mr. Blank, putting additional stress on Ms. Remler as she had to begin to take care of her husband at home.**

129.   Following his surgery, Mr. Blank has been unable to walk.

130.   When looking for accommodations after surgery, it was Ms. Remler who found Riverside. She liked the beautiful view of the river.

131.   This made it all the more disappointing when Riverside wound up providing such poor care to her husband during his stay there.

132.   When he was discharged from Riverside, none of his home accommodations were

delivered or set up, so he wound up having to sit in a wheelchair for hours.

133.    Even at this transition from Riverside to home care, it seemed like they were disrespecting and mistreating him, but Mr. Blank and Ms. Remler thought that at least they were now past it. But unfortunately Defendants had other plans.

134.    One day, Ms. Remler saw the Summons with Notice on the floor in front of their door. Ms. Remler and Mr. Blank live in a large building with 10 floors, so it is likely that someone in the building had seen it.

135.    When Mr. Blank saw it, he said, "Didn't they torture me enough? Turn my life in a whirlwind? All they care about is money, not helping people."

136.     When Ms. Remler finally received the Complaint, she was sickened and outraged.

137.    She had to stop reading it because it was so distressing.

138.    Ms. Remler did not commit fraud and resented being accused of it in such a completely baseless way.

139.    It was an insult to her reputation and an assault on her emotional wellbeing.

140.    She was also outraged that they were demanding attorney's fees.

141.    Ms. Remler felt that the lawsuit was unfair and that they were being bullied.

142.    Every time she thinks about the lawsuit she can feel her blood pressure going up, and she cannot help but think of it every time she sees the file or gets a phone call about it.

143.    It makes her even angrier because of how Riverside had advertised itself to her as this premiere rehab facility for Mr. Blank to recover in.

144.    Ms. Remler had no idea how she was going to handle the lawsuit when she was already so busy taking care of Mr. Blank and having a full time job.

145.    Around 3 nights every week she had problems sleeping due to her stress, any night where

she thinks about this and it makes her angry. She has continued to have problems sleeping from the stress throughout the last year.

146.    She tries to avoid it because it harms her wellbeing. She does yoga, goes out into nature, and tries to lose herself in her work to get her mind off of it. Ms. Remler feels like if she did not do this mitigation that the stress could give her a heart attack.

147.    Ms. Remler stress eats – while she does not weigh herself regularly, she does know that she's at a high.

148.    With the COVID-19 pandemic and having to take care of her paraplegic husband, Ms. Remler was already under so much stress, and with the lawsuit against her she felt like her life was out of her control.

149.    She felt like her husband's debt would be covered by her insurance, so Ms. Remler was especially scared about the attorney's fees since they would not be so-covered and she could not afford them.

150.    Ms. Remler had been happy to put Riverside behind her and out of her mind, to not have to think about that terrible experience again, but then the lawsuit forced it back into their lives.

### D.    COUNT # 1: VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT (AS TO CONA)

151.    Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

152.    The purpose of the FDCPA is "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses."  15 U.S.C. § 1692(e); see also *Hamilton v. United Healthcare of La., Inc.*, 310 F.3d 385, 392 (5th Cir. 2002) ("Congress, through the FDCPA, has

legislatively expressed a strong public policy disfavoring dishonest, abusive, and unfair consumer debt collection practices, and clearly intended the FDCPA to have a broad remedial scope.").

153.    Congress designed the FDCPA to be enforced primarily through private parties – such as plaintiff – acting as "private attorneys general."  *See* S. Rep. No. 382, 95th Con., 1st Sess. 5, ("[t]he committee views this legislation as primarily self-enforcing; consumers who have been subject to debt collection abuses will be enforcing compliance"); and *Jacobson v. Healthcare Fin. Servs.,* 516 F.3d 85, 91 (2d Cir. 2008) ("[i]n this way, the FDCPA enlists the efforts of sophisticated consumers like [plaintiff] as 'private attorneys general' to aid their less sophisticated counterparts, who are unlikely themselves to bring suit under the Act, but who are assumed by the Act to benefit from the deterrent effect of civil  actions brought by others.").

154.    The obligation allege to be owed by plaintiff is a "debt" as defined by 15 U.S.C. § 1692a(5) because the putative nursing home debt was incurred primarily for family, personal or household purposes.

155.    Plaintiff is a "consumer" as defined by 15 U.S.C. § 1692a(3) because Plaintiff was alleged to owe a "debt."

156.    Defendants are "debt collector[s]" as defined in 15 U.S.C. § 1692a(6) because they regularly attempt to collect debts, directly or indirectly.

157.    Defendants collect putative debts by filing hundreds of collection lawsuits seeking to collect putative nursing home debts.

158.    On information and belief, Defendant also sends out hundreds of collection letters seeking to collect putative nursing home debts.

159.    The actions of Defendant enumerated in the above statement of facts constitute an

attempt to collect a debt, or were taken in connection with an attempt to collect a debt, within the meaning of the FDCPA.

160.    Defendant violated the following sections of the FDCPA: 15 U.S.C. §§ 1692e and 1692f. By way of example and not limitation Defendant violated the FDCPA by taking the following actions in an attempt to collect a debt or in connection with an attempt to collect a debt: using false, deceptive or misleading representations or means; misrepresenting the character, amount, or legal status of the debt; misrepresenting the services rendered or compensation which may be lawfully received; falsely representing or implying that a communication is from an attorney; threatening to take and actually taking an action prohibited by law; falsly representing or implying that a consumer committed any crime or other conduct in order to disgrace the consumer; using any false, deceptive or misleading representations or means; using unfair or unconscionable means; and collecting or seeking to collect any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

161.    The injuries inflicted on Plaintiff by Defendants are concrete and particular, and these injuries have a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts.

162.    Ms. Remler suffered economic injuries that historically has provided a basis for lawsuits in American courts, including but not limited to out of pocket expenses for making copies, for postage, and for hiring counsel to represent her in the collection lawsuit, becoming contractually liable to pay attorneys' fees and costs.

163.    Ms. Remler's injuries are analogous to, *inter alia*, the following common law claims: defamation, negligence, invasion of privacy, intrusion upon seclusion, malicious civil

28

prosecution, and abuse of process.

164.    Defendants had a duty to exercise reasonable care in the collection of debts, including in the selection of companies to attempt to collect the debt, in ensuring that a debt is not linked to the wrong party, and in furnishing agents with accurate information when those agents rely on and use that information in attempting to collect debts.

**E.    COUNT #2: NY JUDICIARY LAW § 487 (AS TO CONA)**

165.    Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

166.    New York Judiciary Law § 487 creates a private right of action against an attorney or counselor who "[i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party;" or "willfully receives any money or allowance for or on account of any money which he has not laid out, or becomes answerable for."

167.    As enumerated in the Statement of Facts, Cona violated Judiciary Law § 487, and these violations were part of a larger fraudulent scheme greater in scope than the issues determined in the collection lawsuit against Ms. Remler.

168.    Judiciary Law § 487 is a traditional cause of action in American courts - N.Y. Judiciary Law § 487 is "the modern-day counterpart of a statute dating from the first decades after Magna Carta; its language virtually (and remarkably) unchanged from that of a law adopted by New York's Legislature two years before the United States Constitution was ratified." *Amalfitano v. Rosenberg,* 12 N.Y.3d 8, 14 (2009).

169.    Plaintiff is entitled to actual damages, treble damages, and attorneys' fees and costs for the violations of N.Y. Judiciary Law § 487, and Plaintiff so seeks.

**F.    COUNT #3: NEW YORK GENERAL BUSINESS LAW §**

## 349 (AS TO ALL DEFENDANTS)

170.    Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

171.    New York General Business Law Section 349(a) prohibits "deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in this state…"

172.    An individual "injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both." N.Y. Gen. Bus. Law § 349(h).

173.    Defendants' actions were consumer oriented.  Conduct does not require a repetition or pattern of deception in order to be consumer oriented. However, the facts outlined in the statement of facts plausibly allege such repetition or pattern.

174.    Defendant committed the above described acts willfully and/or knowingly.

175.    Defendant's wrongful and deceptive acts caused injury and damages to Plaintiff.

176.    As a direct and proximate result of those violations of N.Y. Gen. Bus. Law § 349 et seq, Plaintiff suffered compensable harm and is entitled to preliminary and permanent injunctive relief, as to recover actual and punitive damages, costs and attorney's fees.

177.    The injuries inflicted on Plaintiff by Defendants are concrete and particular, and these injuries have a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts.

178.    Ms. Remler suffered economic injuries that historically has provided a basis for lawsuits in American courts, including but not limited to out of pocket expenses for making copies, for postage, and for hiring counsel to represent her in the collection lawsuit, becoming contractually liable to pay attorneys' fees and costs.

179.    Ms. Remler's injuries are analogous to, *inter alia*, the following common law claims: defamation, negligence, invasion of privacy, intrusion upon seclusion, malicious civil prosecution, and abuse of process.

180.    Defendants had a duty to exercise reasonable care in the collection of debts, including in the selection of companies to attempt to collect the debt, in ensuring that a debt is not linked to the wrong party, and in furnishing agents with accurate information when those agents rely on and use that information in attempting to collect debts.

### G.    COUNT #4: GROSS NEGLIGENCE (AS TO ALL DEFENDANTS)

181.    Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

182.    Defendants' failure to exercise even slight care or diligence amounts to gross negligence.

183.    Moreover, had Defendants exercised even slight diligence they would have known their conduct was unlawful.

184.    Defendants' actions evince a reckless disregard for the rights of Ms. Remler and others. The actions have the appearance of intentional wrongdoing. Defendants' conduct was part of a broader pattern of misconduct aimed at the public in general.

185.    Defendants' conduct demonstrates a high degree of moral culpability and willful or wanton negligence or recklessness. As a result, Ms. Remler is entitled to a punitive damage award.

### H.    JURY DEMAND.

186.    Plaintiff demands a trial by jury.

### I.    PRAYER

187.    WHEREFORE, Plaintiff requests the following relief:

a.   A declaration Defendant has committed the violations of law alleged in this action;

b.   An order enjoining and directing Defendant to cease violating G.B.L. § 349 *et seq.*;

c.   Statutory damages under 15 U.S.C. § 1692k;

d.   An order awarding disbursements, costs, and attorneys' fees;

e.   A judgment for actual, punitive, statutory, and treble damages;

f.   Prejudgment and post judgment interest as allowed by law;

g.   All other relief, in law and in equity, both special and general, to which Plaintiff may be

justly entitled.

Dated:  Brooklyn, New York
        September 17, 2021

Respectfully submitted,
/s/
Ahmad Keshavarz
The Law Office of Ahmad Keshavarz
16 Court St., Ste. 2600
Brooklyn, NY 11241
Phone: (718) 522-7900
Fax:    (877) 496-7809
Email: ahmad@NewYorkConsumerAttorney.com